UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JAMES ANTHONY WILLIAMS,

                Plaintiff,

    v.

BRUCE C. GAGE, et al.,

                Defendants.

Case No. C18-0218-JCC-MAT

REPORT AND RECOMMENDATION

       Plaintiff is a state prisoner who is proceeding *pro se* and *in forma pauperis* in this 42 U.S.C. § 1983 civil rights action against 20 employees of the Washington State Department of Corrections ("DOC"), most of whom work at the Monroe Correctional Complex ("MCC") in Monroe, Washington. Plaintiff is currently housed at the Washington State Penitentiary ("WSP") in Walla Walla, Washington. Currently before the Court is defendants' motion for summary judgment. Dkt. 122. Plaintiff opposes the motion. Dkt. 164. Defendants did not file a reply. Having considered the parties' submissions, the balance of the record, and the governing law, the Court recommends that defendants' motion (Dkt. 122) be GRANTED and plaintiff's complaint be DISMISSED WITHOUT PREJUDICE based on plaintiff's failure to exhaust his administrative remedies regarding the claims raised in the complaint.

REPORT AND RECOMMENDATION - 1

I.     BACKGROUND

The Court previously summarized the allegations in plaintiff's complaint as follows:

Plaintiff divides his complaint into 13 "grounds," most of which relate to a period when he was incarcerated at the Monroe Correctional Complex. In ground 1, he alleges that Dr. Gage and Dr. Rainer, who supervise DOC's mental health services, are a part of a conspiracy against him that began in 2015. (Dkt. 11 at 5.) He alleges that in October 2015, the doctors ordered that he be transferred out of a mental health unit and into an intensive management unit ("IMU") for the purpose of separating him from his legal materials. (*Id.*) He alleges that Dr. Gage and Dr. Rainer know that he suffers from "SHU-syndrome," which is caused by being housed in solitary confinement for long periods of time, and yet they still ordered that he be transferred to an IMU. (*Id.* at 7.) He identifies four other health care professionals who allegedly refused to recommend that he be transferred out of the IMU. (*Id.* at 8-9.) He alleges that when he arrived at the IMU, officers, whom he does not identify, violated his constitutional rights in various ways. (*Id.* at 6.) Plaintiff alleges that in this lawsuit, he is suing Dr. Gage and Dr. Rainer because they are the primary cause of him cutting himself on three different dates, as alleged below. (*Id.* at 8.) Plaintiff asserts claims under the First, Eighth, and Fourteenth Amendments, as well as the Americans with Disabilities Act, based on the above allegations. (*Id.*)

In ground 2, plaintiff alleges that on January 8, 2018, Classification Officer Collins and Sergeant Roos put him in a strip cell so they could take his legal materials, and as a result, he started cutting himself. (*Id.* at 10.) Plaintiff alleges that their actions violated his First, Eighth, and Fourteenth Amendment rights. (*Id.*) In ground 3, plaintiff alleges that on January 9, 2018, he informed Officer Cook, Sergeant Meek, and Lieutenant Mui that he was suicidal because he had not slept for several days due to the conditions of the strip cell where he was housed. (*Id.* at 11.) Allegedly, plaintiff started to cut himself, and Officer Cook, Sergeant Meek, and Lieutenant Mui let him continue all night. (*Id.* at 13.) Plaintiff alleges that in the morning, a physician's assistant came and put steri-strips on his wound. (*Id.*) Plaintiff identifies four other DOC employees who were present during this episode. (*Id.*) In ground 4, plaintiff alleges that on January 10, 2018, he started to cut himself again and also spread feces around his cell. (*Id.* at 15.) Plaintiff alleges that Officer Cook and Lieutenant Mui knew what was going on but would not strap him down to a bed, as he requested. (*Id.*) Plaintiff alleges that defendants violated the DOC's hygiene policy. (*Id.*) In ground 5, plaintiff alleges that on January 11, 2018, he was feeling suicidal because he had not slept or had a blanket for six days, so he covered the camera in his room with feces to get staff to strap him down to a bed. (*Id.* at 17-19.) He alleges that Officer Cook and Lieutenant Walters were aware of his actions. (*Id.* at 19.) Plaintiff alleges that around 2:00 a.m. on January 12, 2018, he got Officer Cook to write two emergency grievances for him, but no one properly responded to the grievances. (*Id.*) Plaintiff alleges that later that morning, Officer Simpson refused to give him breakfast, so plaintiff started cutting himself again, and then he was denied lunch. (*Id.* at 20-21.) Plaintiff identifies four other DOC employees who were aware of what was going on. (*Id.* at 20.) Plaintiff also alleges that Lieutenant Walters made him crawl through feces to get out of his cell even though he had a cut on his knee, and then later put him back in the same cell with feces on the ceiling. (*Id.* at 21.)

In ground 6, plaintiff alleges that on January 17, 2018, he was feeling suicidal and staff strapped him to a bed. (*Id.* at 22.) He alleges that this helped his mental health, but his

REPORT AND RECOMMENDATION - 2

counselor, Vilma Khoumpizay, and an unidentified doctor told him that he was going back to the IMU. (*Id.*) Plaintiff alleges that two officers physically moved him back to the IMU, and then he immediately started cutting himself. (*Id.*) In ground 7, plaintiff alleges that Brandi Blair, the grievance coordinator, would not let him file emergency grievances regarding cutting himself. (*Id.* at 24.) He claims that this violates his First, Eighth, and Fourteenth Amendment rights. (*Id.*)

In ground 8, plaintiff alleges that for the last five months, Sergeant Kleinman has refused to give him legal materials and law books that he needs to litigate this lawsuit. (*Id.* at 25.) In ground 9, plaintiff alleges that he filed a kite asking Sergeant Kleinman for legal materials and stating that he would sue the sergeant if he did not get any legal materials. (*Id.*) Plaintiff alleges that Sergeant Kleinman infracted him for this threat. (*Id.*) In ground 10, plaintiff alleges that Infraction Hearing Officer T. Olmsted-Fredrickson found plaintiff guilty of the infraction Sergeant Kleinman issued. (*Id.*) Plaintiff claims that he has a constitutional right to tell Sergeant Kleinman that the sergeant was violating his constitutional rights and that he will sue. (*Id.*) Plaintiff claims in grounds 8 through 10 that Sergeant Kleinman and Officer Olmsted-Fredrickson violated his First, Eighth, and Fourteenth Amendment rights. (*Id.*)

In ground 11, plaintiff alleges that law librarian Miriam Dominique-Kastle refuses to give him the legal materials he needs to litigate this case. (*Id.* at 26.) In ground 12, plaintiff alleges that Superintendent Jack Warner refuses to order Property Officer Bowling and Classification Officer Collins to give him his legal records, which impedes his ability to litigate this case. (*Id.*) In ground 13, plaintiff alleges that Officer Bowling refuses to give him his legal records, which he needs to litigate this lawsuit. (*Id.*)

As relief, plaintiff seeks an order requiring the DOC to transfer him out of the IMU, document that he has "SHU-syndrome," and provide him therapy. (*Id.* at 4.) He also seeks monetary damages for his physical and mental injuries. (*Id.*)

Dkt. 43, at 2-4 (footnote omitted).

On July 6, 2020, defendants moved for summary judgment on several grounds including plaintiff's failure to exhaust his administrative remedies. Dkt. 122. Plaintiff subsequently sought an extension of time to respond to defendants' motion as well as additional relief based in part on allegations that he had inadequate access to his legal documents and to legal research materials. *See* Dkts. 130, 131. On August 26, 2020, the Court granted plaintiff's request for an extension of time giving him until October 26, 2020, to respond to defendants' motion for summary judgment. Dkt. 137. The Court also deferred ruling on portions of plaintiff's motions related to his access to his legal property and legal research materials, directing the parties to file status reports regarding plaintiff's access to his legal documents and the law library. *Id.* The parties filed status reports and

REPORT AND RECOMMENDATION - 3

on September 22, 2020, the Court denied the remaining portions of plaintiff's motions related to his access to his legal property and legal research materials. Dkt. 151. The Court concluded, in relevant part, that the submissions showed that,

> [Facility staff] are providing Plaintiff timely and appropriate access to his legal property while also ensuring the safe operation of the unit. Plaintiff cannot expect to be permitted to review all of his legal property in a holding cell if he has recently engaged in inappropriate behavior, and the Court will not order Defendants to risk the safety and security of the institution to provide Plaintiff with such access. […]
>
> [I]t appears that facility staff are acting in good faith to provide Plaintiff with opportunities to access legal research materials, but Plaintiff has not taken advantage of the support they are offering.

*Id.*

Plaintiff failed to file a response to defendants' motion by the October 26, 2020, deadline. On November 27, 2020, plaintiff moved for a further extension of time to respond to defendants' motion in part based again on allegations of inadequate access to his legal property and legal research materials. Dkt. 158. By order dated December 28, 2020, the Court determined again that,

> Based upon the parties' submissions, it appears to the Court that facility staff are acting in good faith to provide plaintiff with the opportunity to access legal research materials as well as his own legal materials but that, in some instances, plaintiff has not taken advantage of those opportunities or his aggressive behavior towards staff has limited his opportunities.

Dkt. 162. However, because plaintiff had been transferred to a new facility, WSP, during some of the period when he was required to prepare his response to defendants' motion for summary judgment, the Court granted plaintiff one final extension of time, until February 12, 2021, to respond to defendants' motion. *Id.* The Court's December 28, 2020, order informed plaintiff that no further extensions of time to respond to defendants' motion would be granted and that if he failed to file a response by February 12, 2021, the Court would proceed to decide the motion on

REPORT AND RECOMMENDATION - 4

the existing record. *Id.* On February 11, 2021, plaintiff filed a response to defendants' motion.[1] Dkt. 164. Defendants did not file a reply.

## II.  DISCUSSION

A.  Summary Judgment Standard

Summary judgment is appropriate when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of showing the district court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The moving party can carry its initial burden by producing affirmative evidence that negates an essential element of the nonmovant's case, or by establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to establish a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in favor of the nonmoving party. *Id.* at 585-87.

---

[1] The Court notes that in his response to defendants' motion for summary judgment, plaintiff continues to request additional time to respond to the motion. Dkt. 164. However, the Court is not persuaded that additional time is necessary or appropriate. As described above defendants' motion for summary judgment was filed in July 2020 and has been re-noted several times based on plaintiff's request for additional time for any number of reasons. The Court has allowed plaintiff substantial extensions of time to respond to defendants' motion. Further, despite some of plaintiff's allegations, the parties' prior submissions have shown that facility staff have been acting in good faith to provide plaintiff access to his legal property and legal research materials but that plaintiff's aggressive behavior towards staff had at times limited those opportunities. Dkts. 151, 162. Plaintiff was informed in the Court's last order that no further extensions of time would be granted and that if plaintiff failed to respond the Court would proceed to decide defendants' motion on the existing record. Dkt. 162.

REPORT AND RECOMMENDATION - 5

In supporting a factual position, a party must "cit[e] to particular parts of materials in the record . . .; or show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 585. "[T]he requirement is that there be no *genuine* issue of material fact. . . . Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52.

The opposing party must present significant and probative evidence to support its claim or defense. *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991). "The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient[]" to defeat summary judgment. *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Nor can the nonmoving party "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc*., 343 F.3d 1107, 1112 (9th Cir. 2003).

B.  Exhaustion

Defendants allege plaintiff failed to exhaust the administrative remedies available to him as to the claims alleged in the complaint. Dkt. 122, at 9-10; Dkt. 126, Smith Decl. Plaintiff does not address the exhaustion issue in his response to defendants' motion. Dkt. 164.

Before a prisoner may bring a civil rights action under 42 U.S.C. § 1983, he must first exhaust all available administrative remedies. Under the Prison Litigation Reform Act of 1995 ("PLRA"),

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). Exhaustion in cases covered by § 1997e(a) is mandatory. *Booth v. Churner*, 532 U.S. 731, 739 (2001). The mere fact a plaintiff has filed an initial grievance under a prison's grievance policy does not satisfy the PLRA exhaustion requirement; a plaintiff must exhaust *all* levels of an available grievance procedure before he can initiate litigation. *See id.* at 736-41; *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is still a prerequisite to suit. *Booth*, 532 U.S. at 741. If a claim is not exhausted, it must be dismissed. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002).

Failure to exhaust administrative remedies is properly brought as a summary judgment motion. *Albino v. Baca*, 747 F.3d 1162, 1168 (9th Cir. 2014). Once the defendant proves there was an available administrative remedy and the offender failed to exhaust the available remedy, the burden shifts to the plaintiff. The plaintiff must show there was something about his particular claim which made the "existing and generally available administrative remedies effectively unavailable to him." *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (citing *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 n.5 (9th Cir. 1996)).

Defendants' evidence shows prisoners in the custody of the Washington State Department of Corrections ("DOC") may file administrative grievances pertaining to a wide range of issues including: DOC institution policies, rules, and procedures; the application of such policies, rules, and procedures; the lack of policies, rules, or procedures that directly affect the living conditions of the offender; the actions of staff and volunteers; the actions of other inmates; retaliation by staff for

filing grievances; and physical plant conditions. Dkt. 126, Smith Decl., at 2; Dkt. 126-1, DOC Offender Grievance Program Manual. Prisoners may also file emergency grievances if the issue involves a potentially serious threat to the life or health of an inmate or staff member, relates to severe pain being suffered by the offender, or involves a potential threat to the orderly operation of a facility, and its resolution would be too late if handled through routine administrative or grievance channels. Dkt. 126-1, at 8.

Under DOC policy, the grievance procedure consists of four levels of review. Dkt. 126, at 3-4. At Level 0, designated as the "complaint or informal level", the Grievance Coordinator at the prison receives a written complaint from an offender on an issue about which the offender wishes to pursue a formal grievance. *Id.* At this level the facility's "grievance coordinator pursues informal resolution, returns the complaint to the offender for rewriting, returns the complaint to the offender requesting additional information, or accepts the complaint and processes it as a formal grievance." *Id*. Emergency complaints accepted as formal grievances begin at Level 0, routine complaints accepted as formal grievances begin at Level I, complaints accepted as formal grievances alleging staff misconduct are initiated at Level II. *Id.*; Dkt. 126-1, at 18. If the Level 0 grievance is informally resolved, an inmate may appeal the informal resolution if he is not satisfied. Dkt. 126-1, at 19. An inmate may also appeal a Grievance Coordinator's decision that an issue is not grievable. *Id.*, at 18.

If the grievance proceeds beyond Level 0, the grievance coordinator will issue a formal response at Level I, with the exception of staff conduct grievances which are sent directly to Level II. Dkt. 126, at 3-4; Dkt. 126-1, at 18. A prisoner may appeal the denial of a grievance at Level I to the superintendent of the facility at Level II. *See id*. "Inmates may appeal all Level II responses (except emergency grievances) to Department Headquarters in Tumwater, where they are reviewed" at Level III. *Id.*

REPORT AND RECOMMENDATION - 8

When a prisoner files a grievance as an "emergency grievance" staff investigate the issue immediately. *Id.* If staff determine the grievance does not meet the definition of an emergency grievance, this will be noted, and the grievance will be forwarded to the grievance coordinator for processing as a routine grievance. *Id.* Prisoners can appeal the "non-emergency" determination of a medical complaint[2] to the facility superintendent, and also may appeal the grievance responses to those complaints as part of the normal grievance process. *Id.*; Dkt. 126-1, at 8-9.

A Grievance Coordinator may direct that a complaint/grievance be rewritten to conform to the DOC Offender Grievance Program ("OGP"). Dkt. 126, at 4. For example, an offender may be directed to rewrite a complaint/grievance when: "he has not written a simple, straight-forward statement of concern; the complaint contains excessive citations of law or legalese; it contains more than one issue; or the issue has already been grieved[.]" *Id.*; Dkt. 126-1, at 17.

Here, defendants present evidence that during his incarceration plaintiff has filed 978 grievances, most of which were resolved at the lowest level but some of which he pursued to Levels 1 and 2. Dkt. 126, at 5-6. DOC records reflect that plaintiff filed eight grievances related to the issues raised in his complaint during the relevant time period. The details of these eight grievances are outlined specifically below. *Id.*

On January 6, 2018, plaintiff submitted two offender complaint forms designated "emergency" which were both assigned a Grievance I.D. No. 18647391. Dkt. 126-2, at 2-5. Both complaints addressed DOC staff's alleged failure to feed plaintiff dinner on January 6, 2018. *Id.* The Shift Lieutenant issued written determinations that the grievances did "not meet the criteria of an Emergency Grievance" and forwarded them to the Grievance Coordinator for processing. *Id.* On

---

[2] The DOC Grievance Program Manual provides that the determination that a non-medical complaint filed as an "emergency" complaint is a non-emergency is not appealable, but the complaint may be appealed through the regular grievance process. Dkt. 126-1, at 8-9.

REPORT AND RECOMMENDATION - 9

January 8, 2018, the Grievance Coordinator, Brandi Blaire, responded to both offender complaints stating that plaintiff had submitted two complaints on the same issue (that no dinner had been served on 1/6/18) and that only one complaint could be submitted per issue. *Id.* She directed plaintiff to rewrite the complaint on one complaint form and return it by January 16, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

On January 11, 2018, plaintiff submitted an offender complaint designated "emergency" which was assigned a Grievance I.D. No. 18647702. Dkt. 126-3, at 2-5. The complaint raised several issues including that Sgt. Roos, Counselor MacIntyre and CUS Collins allegedly placed plaintiff in a strip cell in retaliation for his filing lawsuits, that Lt. Mui, Sgt. Rogers, Sgt. Meek allowed him to cut himself, failed to strap him down, failed to place him in the COA, and failed to give him clothing and bedding. *Id.* The Shift Lieutenant issued a written determination stating that "RN 2 Idiko was directed to conduct a Suicide Assessment in response to the self-harm referral" and that the grievances did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator for processing. *Id.* On January 11, 2018, the Grievance Coordinator responded to the complaints stating that plaintiff had been assessed by medical after filing the complaint and directing plaintiff to rewrite the complaint specifying the dates of the occurrences, clarifying the issue he was intending to grieve, limiting the complaint to the space on the complaint form, and putting separate issues on separate complaint forms. *Id.* She directed plaintiff to rewrite the complaint and return it by January 18, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

On January 11, 2018, plaintiff submitted an offender complaint designated "emergency" which was assigned Grievance I.D. No. 1867926. Dkt. 126-5, at 2-4. The complaint raised several issues including plaintiff's alleged inability to sleep due to being in a strip cell with just a smock and

REPORT AND RECOMMENDATION - 10

lack of bedding or other clothing, that plaintiff had cut himself on various occasions and had open wounds, and that he had smeared feces in his cell and it had not yet been cleaned. *Id.* The Shift Lieutenant issued a written determination that the complaint did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator for processing. *Id.* On January 16, 2018, the Grievance Coordinator responded to the complaint stating that plaintiff had been assessed by medical and any reported wounds were determined to be non-life threatening. *Id.* She further stated that plaintiff had limited access to items per his Conditions of Confinement and his Behavior Management Plan (BMP) due to his behavior due to destruction of items. *Id.* She stated that plaintiff's Conditions of Confinement and BMP were reviewed and updated as needed and were not grievable but that plaintiff may write to the CPM to appeal conditions of confinement. *Id.* The complaint was marked as "informally resolved." *Id.* Plaintiff did not appeal this response.

On January 12, 2018, plaintiff submitted an offender complaint designated "emergency" which was assigned a Grievance I.D. No. 18647997.[3] Dkt. 126-6, at 2-10. The complaint raised several issues including plaintiff's lack of a blanket, threats to cut himself, staff failing to strap down, failing to place him in the COA, failing to give him clothing and bedding, violating DOC's Disruptive Hygiene Protocol, and failing to clean the feces in his cell. *Id.* The Shift Lieutenant issued a written determination stating that plaintiff was housed in the close observation unit (COA) for suicide watch, that he had been assessed by mental health for restrictions while housed in the COA due to his current frustration level based on his verbal threats regarding intent to self-harm. *Id.* The determination further stated that per plaintiff's Conditions of Confinement he was only allowed one

---

[3] The Court notes that plaintiff's complaint refers to two "emergency" grievances written and filed on his behalf by C/O Cook on January 12, 2018. Dkt. 11. However, it appears that while plaintiff's complaints were submitted on two complaint forms the second form indicated it was a continuation of the first complaint and, as such, only one Grievance Log I.D. Number (18647997) was designated. Dkt. 126-6, at 2-3.

REPORT AND RECOMMENDATION - 11

suicide smock. *Id.* The Shift Lieutenant determined the complaint did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator for processing. *Id.* On January 17, 2018, the Grievance Coordinator, responded to the complaint directing plaintiff to rewrite the complaint putting the separate issues on separate complaint forms, limiting each separate complaint to one complaint form, and including the date, approximate time and a clear statement of the issue. *Id.* She directed plaintiff to rewrite the complaint and return it by January 24, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

On January 14, 2018, plaintiff submitted an offender complaint form designated "appeal" which was assigned a Grievance I.D. No. 18647925. Dkt. 126-4, at 1-3. The complaint sought to appeal five prior grievances. *Id.* On January 16, 2018, the Grievance Coordinator responded to the complaint informing plaintiff that he could not appeal five grievances on one form and that each must be appealed on a separate form with the log I.D. number. *Id.* She directed plaintiff to rewrite any appeals separately and to include the log I.D. number. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

Plaintiff submitted another offender complaint which does not include the date it was written but was marked received on January 16, 2018. Dkt. 126-7, at 2-13. The complaint is designated "emergency" and was assigned a Grievance I.D. No. 18647998. *Id.* The complaint raised several issues including that DOC staff refused to feed plaintiff certain meals on January 9, 10, and 11, 2018, violated the Disruptive Hygiene Protocol, allowed plaintiff's camera to remain covered with feces for several hours, violated DOC Mental Health Policy concerning inmates who are mentally ill, failed for several hours to clean the feces or offer him cleaning materials to clean the feces he had spread in his cell and then failed to provide him adequate cleaning materials. *Id.* The Shift Lieutenant issued a written determination stating that plaintiff had become more destructive and that due to his

REPORT AND RECOMMENDATION - 12

intentional smearing of feces, the Disruptive Hygiene Behavior Response protocol was in place during the time of the complaint. *Id.* The Shift Lieutenant determined the complaint did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator for processing. *Id.* On January 17, 2018, the Grievance Coordinator, responded to the complaint directing plaintiff to rewrite the complaint putting the separate issues on separate complaint forms, limiting each separate complaint to one complaint form, and including the date, approximate time and a clear statement of the issue. *Id.* She directed plaintiff to rewrite the complaint and return it by January 24, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

Plaintiff submitted another offender complaint which does not include the date it was written but was marked received on January 16, 2018. Dkt. 126-8, at 2-13. The complaint is designated "emergency" and was assigned a Grievance I.D. No. 18648007. Dkt. 126-8, at 2-17. The complaint is eleven pages and raises several issues including that plaintiff was placed in a strip cell without a blanket, that he asked for a blanket or to be strapped to a bed to keep him from cutting himself but was ignored by staff (although he was at some point placed in a restraint bed), that he cut himself, that DOC staff refused to feed him certain meals, violated the Disruptive Hygiene Protocol, allowed plaintiff's camera to remain covered with feces for several hours, failed for several hours to clean the feces or offer him cleaning materials to clean the feces he had spread in his cell and then failed to provide him adequate cleaning materials. *Id.* The Shift Lieutenant issued a written determination stating that plaintiff was assessed by RN Portman who contacted the Mental Health Duty Officer and it was determined that plaintiff could be released from the Multiple Restraints Bed into the COA cell and that he was safe to remain in the cell. *Id.* The Shift Lieutenant determined the complaint did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator

for processing. *Id.* On January 17, 2018, the Grievance Coordinator, responded to the complaint directing plaintiff to rewrite the complaint putting the separate issues on separate complaint forms, limiting each separate complaint to one complaint form, and including the date, approximate time and a clear statement of the issue. *Id.* She directed plaintiff to rewrite the complaint and return it by January 24, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

On January 18, 2018, plaintiff submitted an offender complaint designated "emergency" which was assigned a Grievance I.D. No. 18648452. Dkt. 126-9, at 2-4. The complaint raised several issues including that plaintiff had been cutting himself as a result of being placed in a strip cell, that when he felt the urge to cut himself he asked staff to strap him down and that they at times refused and at times did strap him down, and that staff were putting wrist restraints on him too tightly causing his hands and fingers to go numb and his shoulders to hurt. *Id.* The Shift Lieutenant issued a written determination stating that the complaint did "not meet the criteria of an Emergency Grievance" and forwarded it to the Grievance Coordinator for processing. *Id.* On January 24, 2018, the Grievance Coordinator responded to the complaint directing plaintiff to rewrite the complaint clarifying the single issue he was grieving and including the date and approximate time. *Id.* She directed plaintiff to rewrite the complaint and return it by January 31, 2018. *Id.* No rewrite was received, and the complaint was marked administratively withdrawn on that basis. *Id.*

In sum, defendants' evidence reflects that all of plaintiff's grievances were resolved at Level 0 and did not reach the highest level of the DOC's grievance process. Dkt. 126, at 5. Six of plaintiff's eight complaints were filed as "emergency" grievances but were determined to be non-emergencies and processed as routine grievances. *Id.* Defendants' evidence shows that plaintiff did not properly appeal the non-emergency determinations or otherwise pursue those grievances through the routine

grievance process. *Id.* Rather, those grievances were returned to plaintiff by the Grievance Coordinator for rewrites consistent with policy and plaintiff failed to resubmit or otherwise pursue those grievances and, accordingly, they were marked administratively withdrawn. *Id.* One of plaintiff's complaints was designated "appeal" and sought to appeal five prior grievances. The grievance was returned to plaintiff by the Grievance Coordinator with the direction that he rewrite each appeal on a separate form and include the log I.D. number. Plaintiff failed to do so, and the grievance was marked administratively withdrawn.

Finally, one of plaintiff's grievances was filed as an "emergency" grievance but was determined to be a non-emergency and processed as a routine grievance. *Id.* Defendants' evidence shows that plaintiff did not appeal the non-emergency determination and the grievance was marked as "informally resolved" at Level 0. *Id.* The Court notes that a prisoner is not required to appeal favorable grievance decisions when he has won all the relief available. *See Harvey v. Jordan*, 605 F.3d 681, 685 (9th Cir. 2010); *Levy v. Washington State Dept. of Corrections*, 2009 WL 1107698 (W.D. Wash. April 23, 2009). However, a prisoner has an obligation to exhaust the administrative process even if he is partially satisfied by the prison's response to his grievance. *See Benitez v. Cty. of Maricopa*, 667 F. App'x 211, 212 (9th Cir. 2016) (noting *Harvey* did not excuse the plaintiff's exhaustion because, unlike in *Harvey*, the plaintiff was not induced to abandon his grievance appeal based on an unfulfilled promise by the prison). Here, plaintiff did not appeal the informal resolution of the grievance nor can it be said that the grievance was resolved entirely in plaintiff's favor as, for instance, plaintiff was not provided the bedding or additional clothing that he sought. Furthermore, plaintiff proceeded to grieve many of the same issues raised in this grievance in future grievances, demonstrating that he was not fully satisfied with the informal resolution.

Based on the evidence detailed above, the Court finds defendants carried their initial burden of showing the absence of exhaustion in this case. Defendants' evidence shows there was a grievance procedure in place at the time of the incidents complained of in the complaint, plaintiff was aware of the grievance process and participated in the grievance process, and plaintiff did not complete the grievance process for the claims alleged in his complaint.

The burden now shifts to plaintiff, "who must show that there is something particular in his case that made the existing and generally available remedies effectively unavailable to him by 'showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile.'" *Williams v. Paramo*, 775 F.3d 1182, 1191 (9th Cir. 2015) (quoting *Albino*, 747 F.3d at 1172). Acts by prison officials preventing the exhaustion of administrative remedies may make administrative remedies effectively unavailable. *See Nunez v. Duncan*, 591 F.2d 1217, 1224-25 (9th Cir. 2010). "The ultimate burden of proof, however, remains with the defendants," and the evidence must be viewed in the light most favorable to the plaintiff. *Paramo*, 775 F.3d at 1191 (citing *Albino*, 747 F.3d at 1172). The Supreme Court has held there are three circumstances in which an administrative remedy is not capable of potential relief:

> First, an administrative procedure is unavailable when it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates. Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use—i.e., some mechanism exists to provide relief, but no ordinary prisoner can navigate it. And finally, a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation.

*Ross v. Blake,* 136 S. Ct. 1850, 1853–1854 (2016).

Here, plaintiff's response to defendants' motion fails to address the exhaustion issue at all.[4] The evidence shows plaintiff did not fully follow the proper grievance procedures available nor does he present a credible argument that he was barred from doing so. *See Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ("a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court"). Plaintiff fails to rebut defendants' showing that he failed to exhaust administrative remedies available to him with respect to his claims. Therefore, the Court concludes plaintiff failed to properly exhaust the claims alleged in the complaint and the complaint should be dismissed without prejudice. *Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003) *overruled on other grounds by Albino,* 747 F.3d at 1162 ("If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice."); *Carrea v. California*,

---

[4] The Court notes that plaintiff does allege generally in his complaint that Brandi Blaire (the Grievance Coordinator) would not allow him to file emergency grievances related to his cutting. Dkt. 11. He also alleges that on January 12, 2018, he got Officer Cook to write two emergency grievances for him but that "Walters didn't follow policy and send me his replie [sic] within the 1 hour the grievance policy mandates. In fact I never received a reply[.]" Dkt. 11. The Court notes in the first instance that plaintiff cannot rely on conclusory allegations in the complaint alone to defeat summary judgment. *Hernandez*, 343 F.3d at 1112. However, even if the Court were to consider these allegations, the evidence shows that plaintiff was able to and did file emergency grievances during this period but that those grievances were determined to be non-emergencies by the Shift Lieutenant and, pursuant to policy, were forwarded to the Grievance Coordinator, Ms. Blaire, to be evaluated as routine grievances. The evidence further shows that Ms. Blaire did issue responses to those grievances (including the January 12, 2018 grievances submitted by Officer Cook) marking one as "informally resolved" and directing plaintiff to re-write the others, but that plaintiff failed to do so. To the extent plaintiff intends the assertions in his complaint to address the exhaustion issue, the evidence does not support the argument that plaintiff did not have the opportunity to exhaust these claims. The record shows that plaintiff's January 12, 2018, complaints were routed to the Grievance Coordinator who gave him the opportunity to rewrite his complaint, but that he failed to do so. Finally, to the extent plaintiff intends to raise a separate claim regarding alleged errors in the grievance process, such an argument fails to state a constitutional claim. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) ("[I]nmates lack a separate constitutional entitlement to a specific prison grievance procedure[,]"); *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (*per curiam*) ("'A prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.'" (citation and internal punctuation omitted)).

REPORT AND RECOMMENDATION - 17

551 F. App'x 368, 369 (9th Cir. 2014) (remanding for the entry of dismissal without prejudice because the proper remedy for non-exhaustion is dismissal without prejudice). Accordingly, the Court recommends defendants' motion for summary judgment (Dkt. 122) be granted and the complaint be dismissed without prejudice.[5]

### III. CONCLUSION

The Court recommends defendants' motion for summary judgment (Dkt. 122) be GRANTED and plaintiff's complaint be DISMISSED WITHOUT PREJUDICE based on plaintiff's failure to exhaust his administrative remedies regarding the claims raised in the complaint. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **March 26, 2021**.

Dated this 2nd day of March, 2021.

Mary Alice Theiler
United States Magistrate Judge

---

[5] Because the Court concludes defendants are entitled to summary judgment on the exhaustion issue it does not reach the other grounds raised in defendants' motion.